# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **LARRY DAVID JACKSON,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:10CV00060 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **OFFICER RANDALL E.** | ) | By: James P. Jones |
| **BRICKEY, ET AL.,** | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

*Richard F. Hawkins III, The Hawkins Law Firm, PC, Richmond, Virginia, for Plaintiff; Cameron S. Bell, Penn, Stuart, & Eskridge, Abingdon, Virginia for Defendants.*

This civil case emanates from the 2009 arrest of the plaintiff, Larry David Jackson, for obstruction of justice. The arrest followed Jackson's encounter with a Saltville, Virginia, police officer in the driveway of Jackson's home while the officer was in the process of issuing a traffic citation to Jackson's son. Jackson has now sued the arresting officer, the chief of police, and the Town of Saltville, pursuant to 42 U.S.C.A. § 1983 (West 2010) for violation of his constitutional rights, along with pendent state law claims. All of the defendants have moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The motion has been argued and is ripe for decision.

With his Complaint, the plaintiff submitted a videotape taken from a mounted recorder in the police cruiser and a corresponding transcript prepared by the plaintiff of the audio portion of the video. The defendants contest the accuracy of the video and the transcript, arguing that this evidence fails to capture the full events of the arrest. Nevertheless, under familiar principles, I must accept at this time for the purposes of the Motion to Dismiss, the plaintiff's recitation of the facts.

Based on the plaintiff's allegations in his Complaint, including his version as shown by the video and the transcript, the facts are as follows.

In the early morning hours of January 2, 2009, Randall E. Brickey, an officer with the Saltville Police Department, clocked the plaintiff's son, Eric Jackson ("Eric"), speeding.[1] Officer Brickey followed Eric's car and turned on his police lights, catching up with Eric after he pulled into the driveway in front of his home. Officer Brickey blocked Eric's car in the driveway, leaving on his spotlight and flashing lights.

By the time Officer Brickey pulled into the Jackson family driveway, Eric had already exited and was standing aside his vehicle. Officer Brickey approached Eric,

---

[1] For clarity, I will refer to the plaintiff as "Jackson" and other members of the Jackson family by their first names.

requested his driver's license, and asked Eric if he knew why he had been stopped. Eric admitted that he was "probably" speeding "a little bit." Officer Brickey then informed Eric, "You were doing 97 miles an hour." Eric responded, "I don't think it was that fast." Officer Brickey reiterated the speed and then instructed Eric to remain in his car.

Officer Brickey returned to his cruiser to check Eric's license with dispatch operators. At some point while waiting for this information, Eric exited his car and met his father, plaintiff Jackson, on the porch of the home. After a brief discussion, Eric and Jackson descended the porch steps and walked towards Officer Brickey's cruiser. Several yards away from the vehicle, Jackson raised his hands and briefly waved, signaling his approach.

Officer Brickey rolled down his window, and the parties contest whether Jackson first asked Officer Brickey to turn off his flashing lights, so as not to draw the attention of the neighbors. Jackson told Officer Brickey, "He [Eric] wasn't going 97 miles an hour." Officer Brickey authoritatively responded, "You can either go back into the house, or I can arrest you." Jackson replied, "Well, I'll have, I'll be –."[2] Officer Brickey immediately exited his vehicle and shouted that Jackson was under

---

[2] Officer Brickey claims that Jackson also replied, "You'll have to arrest me, then," but that does not appear on the transcript nor is it audible on the recording.

arrest. Jackson turned and started back to his house, but made only a few steps before Officer Brickey took him by the arm and told Jackson he was under arrest for obstruction of justice. Jackson was then handcuffed and placed in the back of Officer Brickey's cruiser.

Jackson's arrest brought his wife, Shirley Jackson ("Shirley"), to the door of the family home. Shirley remained inside the home, but was audibly cursing at Officer Brickey from the front door. Eric, still on the driveway after his traffic stop, was joined by his brother, Larry Christopher Jackson ("Christopher"). During and after Jackson's arrest, the brothers paced the driveway, loudly criticizing and cursing Officer Brickey, calling him a "clown" and a "joke" and using other profanity. The three men opprobriously discussed calling state police and their lawyer, and made comments ostensibly threatening Officer Brickey with a future lawsuit.

Officer Brickey, having called dispatch for backup and informing the department of Jackson's arrest, told Eric to remain in his vehicle. When Eric failed to comply with that arrest, Officer Brickey pepper sprayed him, handcuffed him, and also placed him under arrest.

Christopher fled up the porch stairs and back into the home, where he was pursued by Officer Brickey. Shirley repeatedly refused to allow Officer Brickey into the home to arrest Christopher, and instructed Christopher to stay in the house. To

this, Officer Brickey replied that he would "get him" eventually. As Officer Brickey waited for back-up, Eric and Jackson continued from the backseat of the police cruiser to protest their arrest, criticize Officer Brickey, and assert that they would have "a helluva lawsuit." Christopher entered and exited the house, but remained on the porch, during this period.

At this point, additional officers from other jurisdictions arrived on the scene. Among these officers were Barry S. Surber, the Chief of the Saltville Police Department; two additional officers from the Saltville police; a deputy from the Smyth County Sheriff's Office; and an officer from the neighboring Chilhowie Police Department.

Upon their arrival, Officer Brickey returned to the porch of the Jackson home and again told Christopher and Shirley that Christopher needed to exit the house because he was under arrest. When Shirley refused to allow Officer Brickey into her home, he reached in and attempted to grab Christopher's arm. Shirley slammed the door on Officer Brickey's arm, and he retreated, telling Shirley, "You'll go, too."

A younger woman, identified as a girlfriend, also exited the home and came down the driveway to the officers with her hands raised. After being told to return to the house and to inform Christopher that he was under arrest, she complied. After

some discussion, the officers returned to the Jackson porch and arrested Christopher there, all the while with Christopher obstreperously sassing the officers and cursing.

During Christopher's arrest, Landon Smith, one of the other Saltville police officers, asked Brickey in reference to Shirley, "Who's the woman? Does she need to go?" Officer Brickey replied, "I don't know. She throwed the door shut on me as I reached in there to grab him." Officer Smith replied that Shirley's actions also constituted obstruction of justice, and the officers agreed to "go get her."

Officer Brickey then told Shirley that she was also under arrest for obstruction of justice, despite Shirley's protestations that she had not left her house. He told her that he could wait for a warrant, but that she was going to be arrested in any event. Officer Brickey, as well as another unidentified officer, further advised Shirley that by closing the door on Officer Brickey's arm she obstructed justice. After some back and forth discussion, Shirley agreed to be arrested without a warrant.

In a conversation in the Jackson driveway following the arrests that was caught on the audio recording, Officer Brickey recounted his version of the events to his fellow officers. Officer Brickey asserted that the arrests were all based on obstruction of justice charges, indicated fear for his safety, and told the other officers that the Jacksons collectively obstructed his duties by failing to comply with his orders. The other officers generally supported Officer Brickey's account.

Following the arrests, the cases were taken up by the local state prosecutor. Jackson contends that an assistant Commonwealth's Attorney stated in pretrial discussions that the chief of police asked the prosecutor not to offer the Jackson family any deals. Jackson also asserts that the only settlement offer eventually provided included a provision requiring Jackson to formally exonerate and apologize to the other officers on the scene, a provision he contends was procured by Chief Surber in order to effectively bar the Jacksons from bringing a civil lawsuit.

Charges for obstruction of justice stemming from the above events went to trial in the Smyth County General District Court. Jackson and his sons were convicted and appealed their convictions to the Circuit Court. During pre-trial motions the presiding judge of the Circuit Court watched the same videotape of the events provided to this court. Jackson alleges that the judge stated that he was "shocked" and "appalled" by the police conduct, and chastised the assistant Commonwealth's Attorney for proceeding with the case to trial.

Jackson contends that the judge's comments prompted the prosecution to dismiss the charges against him, to file a nolle prosequi motion against Shirley, and to offer reduced penalties to Eric and Christopher. Jackson asserts that he expended nearly $11,000 in legal fees defending himself and his family.

Following the disposition of the criminal cases, Jackson contends that he and his family members have been repeatedly harassed by various officials of the neighboring Town of Chilhowie. He asserts that they have been acting in concert with the defendants to intimidate and to harass him in an effort to dissuade him from filing the current suit.

## II

Defendants Officer Brickey, Chief Surber, and the Town of Saltville (the "Town") have filed a joint Motion to Dismiss. A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to the plaintiff, the plaintiff is not entitled to relief.

I turn first to Jackson's claims under § 1983 related to his arrest. Because liability under § 1983 attaches differently as to each defendant based on their respective roles in the arrest, I discuss each separately.

## A

Officer Brickey moves to dismiss based on the doctrine of qualified immunity.

Police officers, like other government officials, are immune from § 1983 civil liability "as long as their actions could reasonably have been thought consistent with

the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Consequently, qualified immunity attaches when the government actor's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Subjective intentions do not make the conduct illegal under the Constitution because the officer's state of mind does not invalidate his action as long as that action can be objectively justified. *See Whren v. United States*, 517 U.S. 806 (1996). Moreover, qualified immunity is "an *immunity from suit* rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

Officer Brickey contends that even accepting the  plaintiff's allegations as true,  he had probable cause to arrest Jackson.  He also argues that, in any event, a reasonable police officer in his position would have believed under the facts that probable cause existed for him to arrest Jackson for obstruction of justice.

Probable cause is an objective standard of probability,  justifying arrest when "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances

shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillipo*, 443 U.S. 31, 37 (1979). Whether probable cause existed under given circumstances must be determined by two elements — the suspect's conduct as known to the officer, and the contours of the offense thought to be committed. *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992). If a person is arrested when no reasonable officer could believe in light of the contours of the offense that probable cause existed to make that arrest, the officer has violated the clearly established Fourth Amendment right to be arrested only upon probable cause. *Rogers v. Pendleton*, 249 F.3d 279, 290 (4th Cir. 2001).

Officer Brickey argues that he reasonably interpreted Jackson's conduct to constitute probable cause supporting an arrest for obstruction of justice. Officer Brickey contends that the videotape evidence demonstrates that Jackson "quickly approached Officer Brickey and began arguing with him about Eric Jackson's speed," that "Jackson made no attempt to be respectful," and that Jackson "immediately began questioning Officer Brickey's authority." (Defs.' Br. 8.) Officer Brickey asserts that by continuing to argue and refusing to comply with the order to go back inside the home, Jackson's actions provided probable cause to make a lawful arrest.

Officer Brickey additionally asserts that he had ample reason to fear for his safety, given that he was alone on the scene at night, confronting two adult males.

Lastly, Officer Brickey points to the fact that he was unable to serve a reckless driving summons on Eric that night, which Officer Brickey contends shows that Jackson did, in fact, obstruct him from performing his duties.

Because the probable cause inquiry is informed by the elements of the offense, I must first begin by examining the Virginia statute and related case law. The Virginia obstruction of justice statute provides in pertinent part:

> A.    If any person without just cause knowingly obstructs . . . any law-enforcement officer . . . in the performance of his duties as such or fails or refuses without just cause to cease such obstruction when requested to do so by such . . . law-enforcement officer, . . . he shall be guilty of a Class 1 misdemeanor.

> B.    Except as provided in subsection C, any person who, by threats or force, knowingly attempts to intimidate or impede . . . any law-enforcement officer . . . lawfully engaged in his duties as such, or to obstruct or impede the administration of justice in any court, is guilty of a Class 1 misdemeanor.

Va. Code. Ann. § 18.2-460. Although the Virginia statute appears on plain reading to prohibit any "obstruction" of an officer without qualification, the Virginia courts have interpreted restrictions on the statute's application. *See Wilson v. Kittoe*, 229 F. Supp. 2d 520, 528 (W.D. Va. 2002), *aff'd*, 337 F.3d 392 (4th Cir. 2003).

First, the statute contains a mens rea component. Although it is not necessary for the officer to suffer an actual or technical assault, there must still be "'acts clearly indicating an intention on the part of the accused to prevent the officer from

performing his duty.'" *Ruckman v. Commonwealth*, 505 S.E.2d 388, 389 (Va. App. 1998) (quoting *Jones v. Commonwealth*, 126 S.E. 74, 77 (Va. 1925)).

Second, the Virginia courts require that the offender actually "hinder or obstruct" the police officer in the performance of his duties. *Polk v. Commonwealth*, 358 S.E.2d 770, 772 (Va. App. 1987). "[O]bstruction of justice does not occur when a person fails to cooperate fully with an officer or when the person's conduct merely renders the officer's task more difficult" or frustrates his investigation. *Ruckman*, 505 S.E.2d at 389.

Finally, while the statute does not require actual physical assault on the officer, *see Smith v. Tolley*, 960 F. Supp. 977, 995 (E.D. Va. 1997),Virginia courts have consistently held that peaceful verbal criticism of a police officer does not alone constitute the type of direct action required by statute. *See Kittoe*, 229 F. Supp. 2d at 528. "The general rule is that merely remonstrating with an officer in behalf of another, or criticizing or questioning an officer while he is performing his duty, when done in an orderly manner, does not amount to obstructing or delaying an officer in the performance of his duties." *Id.* at 528-29 (internal quotation marks and citations omitted).

Considering the facts alleged by the plaintiff as true, as I must, I find that Jackson has provided sufficient allegations to support a claim that his arrest lacked

probable cause. At the point of Jackson's arrest, he had engaged in relatively little interaction with Officer Brickey. Jackson alleges that he waved to signal his approach, walked to the police cruiser at a measured and even pace, and respectfully contested Officer Brickey's assessment of Eric's speed. If true, these words and actions would not demonstrate the requisite intent nor the direct action required to make out probable cause for arrest under Va. Code § 18.2-460.

Officer Brickey additionally points to Eric's and Jackson's noncompliance with his orders. Eric disobeyed the order to remain in his vehicle and Jackson refused to comply with Officer Brickey's order that he go back in the house or face arrest. Probable cause for an obstruction arrest may exist when a driver or passenger refuses to obey an order to remain in a lawfully stopped vehicle. *See Figg v. Schroeder*, 312 F.3d 625, 637 (4th Cir. 2002); *Coffey v. Morris*, 401 F. Supp. 2d 542, 546 (W.D. Va. 2005). However, even if Eric's non-compliance as the driver would support his obstruction arrest, Fourth Amendment rights are personal in nature. *Rakas v. Illinois*, 439 U.S. 128, 140 (1978). The sins of the son cannot be transferred to the father for probable cause purposes. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (The probable cause requirement to support a search or seizure "cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another. . .where the person may happen to be.") For similar

reasons, the defendants' heavy reliance on *Coffey v. Morris* is misplaced. The defendants cite to *Coffey* for the proposition that an officer has authority to direct "all movement in a traffic encounter." 401 F. Supp. 2d at 547. *Coffey* is, however, distinguishable on its facts, as that case dealt solely with a passenger in the car, whereas here Jackson was only a bystander to his son's traffic stop.

Moreover, Jackson's personal refusal to obey Officer Brickey's order at best raises triable issues as to probable cause. The Supreme Court has held that there is a danger of silencing constitutionally protected speech by improperly caging it in an order to disperse. *See City of Houston, Tex. v. Hill*, 482 U.S. 451, 462 n.11 (1987). Thus, the police are not authorized to target verbal criticism by way of ordering the individual to disperse. *See id.* Both this circuit and Virginia state law strongly recognize this same principle. *See Kittoe*, 229 F. Supp. 2d at 533 ("Factually and legally, the mere refusal to obey an officer's order does not provide probable cause to arrest under the obstruction of justice statute. Such punishment may only be levied under a more narrowly-tailored statute."). In order for a failure to obey to ripen into facts supporting an obstruction charge, the individual's conduct or words must present the officer with a threat of real, and often physical, harm. *See Kittoe,* 229 F. Supp. 2d at 531 (distinguishing *Kittoe's* facts with those of *Figg*, 312 F.3d at 625, where the plaintiffs in the latter were seemingly volatile, hostile, and likely armed);

*see also Hill*, 482 U.S. at 462 n.10, 11; *Ware v. James City Cnty., Va.,* 652 F. Supp. 2d 693 (E.D. Va. 2009). Officer Brickey may later show such a threat, but this argument cannot be disposed of on the current motion.

Moreover, characterizing Jackson's actions as non-compliant is not apparent on the present facts. The time between Officer Brickey's order to return to the house and Jackson's arrest was a matter of seconds. Although Jackson did not immediately and silently return to his home at Officer Brickey's directive, Jackson did attempt to retreat up the driveway as soon as Officer Brickey exited his vehicle and declared Jackson under arrest. What the defendants deem Jackson's continued defiance consisted — at least on this record — of only a short, confused stutter.

Finally, Officer Brickey's assertion that obstruction in fact is evidenced by his inability to complete Eric's citation on the scene is without merit. As all parties agree and the videotape makes clear, the events (rather unsurprisingly) escalated following Jackson's arrest. Basing an obstruction charge on the disruption caused by an obstruction arrest would allow virtually any arrest for the offense to be justified post hoc. For all these reasons, I find that Jackson has raised sufficient allegations that probable cause was lacking in his arrest.

The constitutional right to be free from arrest without probable cause was clearly established and in light of the long-standing Virginia case authority defining

obstruction of justice, the allegations by Jackson are sufficient to show that a reasonable police officer, under those factual allegations, would have known that he did not have probable cause to arrest Jackson.

B

Jackson also asserts his § 1983 claims against the Chief of Police, Barry Surber.  Although Chief Surber arrived on the scene as part of Officer Brickey's backup, Jackson had already been arrested by that time.  Thus, while Jackson cannot assert a direct action against the chief, he nevertheless contends that Chief Surber "had the authority and power to mitigate and/or undo much of the unlawful conduct that had been committed that evening, but chose not to do so."  (Compl. ¶ 41.)

A supervising officer may be found liable in a § 1983 action for the unconstitutional conduct of his subordinates based on a theory of supervisory liability.  *See Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 203 (4th Cir. 2002).  The test for supervisory liability under § 1983 is a stringent one, involving three elements: (1) that the supervisor had actual or constructive knowledge that his subordinate's conduct posed a pervasive and unreasonable risk of constitutional injury; (2) that the supervisor's response was so inadequate as to show deliberate indifference or tacit authorization; and (3) that there was a causal link between the

supervisor's inaction and the plaintiff's constitutional injury. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

Section 1983 claims are not subject to a "heightened pleading standard." *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993). While a plaintiff need not necessarily plead the multiple instances of constitutional violations that may be necessary to prevail on his claim, *Jordan v. Jackson*, 15 F.3d 333, 339 (4th Cir. 1994), he still must meet the pleading standards as interpreted by the Supreme Court in *Ashcroft v. Iqbal,* 129 S. Ct. 1937 (2009) and *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007). These cases established that a complaint "must be supported by factual allegations" that "plausibly give rise to an entitlement to relief." *Iqbal*, 129 S. Ct. at 1940, 1941.

Within the § 1983 context, the comparatively lenient derivative liability theory of respondeat superior, which imposes liability on the superior automatically by virtue of the employment structure, is wholly inapplicable. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692-94 (1978). Thus, a properly pled claim for supervisory liability must go beyond a theory that the superior is liable merely by virtue of his office. Rather, the allegations must be sufficient to demonstrate a plausible nexus or affirmative link between the supervisor's actions and the constitutional deprivation. *Santiago v. Warminster Twp.*, No. 10-1294, 2010 WL 5071779, at *5 (3d Cir. Dec.

14, 2010).   Requiring that the complaint's pleadings transcend those tending to support vicarious liability to those plausibly demonstrating supervisory liability does not impose a heightened pleading standard, but rather requires the plaintiff to meet the requirements of Rule 8(a).

Here, Jackson has not alleged that Chief Surber was aware of and ignored similar instances of obstruction arrests lacking basis in probable cause.   Instead, Jackson asserts wholly inapposite allegations of misconduct committed by other members of the Saltville police department.   These unrelated allegations do nothing to support the three elements required of supervisory liability, and at best, only reveal a theory that Chief Surber should be held vicariously accountable by virtue of his office for all actions of the Saltville police.

Jackson also alleges that the officers failed to issue Miranda warnings to the Jackson family members.   This allegation is similarly ineffective to support his claims.   A failure to give Miranda warnings risks only a potential violation of Fifth Amendment rights, a danger not reflected in Jackson's current § 1983 claims. Likewise, Jackson's allegation that Chief Surber observed Officer Brickey's attempt to enter the Jackson home to arrest Christopher is equally insufficient.   Because Jackson's allegations fail to plead Chief Surber's knowledge of and deliberate

indifference to factually similar § 1983 violations, he has failed to adequately state a supervisory liability claim against Chief Surber.

Moreover, the pleadings show that when Chief Surber arrived on the scene, Jackson was already under arrest and detained in the back of Officer Brickey's car. Thus, Chief Surber's knowledge of the arrest was necessarily limited to Officer Brickey's representations of the events. Although Jackson argues that Chief Surber could have made further inquiries and thus mitigated the constitutional wrongs already suffered, Chief Surber was under no such duty to do so. The law establishes only that a supervisor cannot be deliberately indifferent to the violation of an individual's rights. It does not burden a superior officer with a heightened affirmative duty to investigate. *Kittoe*, 229 F. Supp. 2d at 538. Moreover, qualified immunity protects Chief Surber's reliance on Officer Brickey's representations, because a supervisor is entitled to reasonably defer to a subordinate's description of events. *See id.*; *see also Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).

Thus, because Jackson's allegations do not set forth any facts implicating Chief Surber as personally involved in Jackson's arrest, nor do they sufficiently plead a claim for supervisory liability under § 1983, I grant the Motion to Dismiss these claims as to Chief Surber.

C

The Town also moves to dismiss for failure to state a claim under § 1983 for municipal liability.

Like the standard for imposing supervisory liability, the requirements for imposing liability on a municipality under § 1983 are strict. *Jordan,* 15 F.3d at 338. In order to establish municipal liability under § 1983, the plaintiff must prove the existence of an official policy or custom that proximately caused the deprivation of the plaintiff's rights. *See Bd. of Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 425 (1997); *Spell v. McDaniel*, 824 F.2d 1380, 1385-87 (4th Cir. 1987). Municipal customs, both formal and informal, are established by persistent, widespread practices of municipal officials, whether specifically authorized or not, that are so permanent and well settled so as to have the force of law. *Bd. of Comm'rs of Bryan Cnty.*, 520 U.S. at 403-04. These practices are attributable to a municipality when they become so frequent in occurrence that actual or constructive knowledge is implied. *Id.*

In the present case, Jackson alleges that his arrest stemmed from the Saltville Police Department's "institution-wide failure to train its officers properly about the rule of law and the Constitutional rights of U.S. citizens" and its "*de facto* institution-wide policies about ignoring or being deliberately indifferent to Constitutional rights

or violations of such rights." (Compl. ¶ 60.) To support these allegations, Jackson cites the same alleged unrelated wrongdoings by the Saltville Police Department noted above.

Jackson is required to support his claim for municipal liability with sufficient factual matter to state a claim for relief under federal pleading standards. In determining the sufficiency of a complaint under our pleading regime, I must identify allegations that "because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 129 S. Ct. at 1950. Jackson's current allegations are limited to mere conclusory statements regarding the police department's failure to train, and thus these statements amount to the "naked assertion[s] devoid of further factual enhancement" that I must disregard for pleading purposes. *Id.* at 1949 (internal quotation marks and citation omitted). As above, Jackson's references to generalized deficiencies within the department do not sufficiently flesh out his allegations. *See Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010); *Miller v. Hamm*, No. CCB-10-243, 2011 WL 9185, at *12 (D. Md. Jan. 3, 2011). Once again, I am not applying a heightened pleading standard to Jackson's claims, but rather requiring Jackson to provide some basis for determining that his allegations are plausible. *See Harden v. Montgomery Cnty., Md.*, No. 8:09-CV-03166-AW, 2010 WL 3938326, at *3 (D. Md. Oct. 6, 2010).

For these reasons, I will grant the request to dismiss the Town as to these § 1983 claims.

D

Jackson also asserts multiple state law tort claims against Officer Brickey pursuant to this court's supplemental jurisdiction. These include claims of assault and battery, false arrest, and false imprisonment. Officer Brickey has not contested the assault and battery charge, but does challenge those for false arrest and false imprisonment.

Virginia law does not recognize a separate cause of action for false arrest. Rather, under Virginia law, the common law tort of false imprisonment is sometimes interchangeably referred to as false arrest. *Cole v. Eckerd Corp.*, 54 Va. Cir. 269, 272 (2000). The Virginia Supreme Court has defined false imprisonment as "the direct restraint by one person of the physical liberty of another without adequate legal justification." *Jordan v. Shands*, 500 S.E.2d 215, 218 (Va. 1998) (internal quotation marks and citation omitted). Claims of false imprisonment may be defeated by showing a sufficient legal excuse, e.g., probable cause, to restrain the plaintiff's liberty. *See Zayre of Va., Inc. v. Gowdy*, 147 S.E.2d 710, 713-14 (Va. 1966). However, I will reject the request to dismiss Jackson's false imprisonment claim for the same reasons that I rejected at this stage, Officer Brickey's qualified immunity

defense. I must dismiss, however, Jackson's false arrest claim (Count V) as duplicative.

IV

Jackson has asserted a § 1983 claim for malicious prosecution against all three defendants, as well as a state law claim under Virginia's common law version of the tort against Officer Brickey and Chief Surber.

As an initial matter, the defendants contest the form of Jackson's § 1983 pleadings. Jackson has styled his allegations in three counts: for false arrest, false imprisonment, and malicious prosecution. The defendants argue that Jackson may not proceed on three separate claims, because § 1983 merely provides "a method for vindicating federal rights elsewhere conferred" and "is not itself a source of substantive rights." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). Particularly targeting Jackson's § 1983 claim for malicious prosecution, the defendants contend that the Fourth Circuit does not recognize a separate § 1983 malicious prosecution claim.

The defendants are mistaken. Although § 1983 by itself does not empower a plaintiff to bring a claim for malicious prosecution, this circuit has held that a plaintiff may file a malicious prosecution claim under § 1983 so long as it is properly

grounded in a Fourth Amendment right. *Lambert v. Williams*, 223 F.3d 257, 260-62 (4th Cir. 2000) (acknowledging a circuit split on this point). The plaintiff's § 1983 allegations here are all based in a single unreasonable seizure claim. The plaintiff separated his claims because their theories of recovery are derived from three independent common law torts, despite the fact that they represent a single constitutional violation. Any recovery on this violation would therefore be determined singly and not multiplied based on the plaintiff's separate theories of recovery.

Turning to Jackson's claims, a malicious prosecution claim under § 1983 incorporates the elements of the common law tort. *Id.,* at 261; *Brooks v. City of Winston-Salem, N.C.,* 85 F.3d 178, 181 (4th Cir. 1996). Therefore, I discuss both claims in concert.

In an action for malicious prosecution, the plaintiff must show "that the prosecution was (1) malicious; (2) instituted by, or with the cooperation of, the defendant; (3) without probable cause; and (4) terminated in a manner not unfavorable to the plaintiff." *Hudson v. Lanier*, 497 S.E.2d 471, 473 (Va. 1998). Malicious prosecution claims are generally disfavored, because the law favors the prosecution of crime, free from concerns of subsequent civil liability. *Reilly v. Shepherd*, 643 S.E.2d 216, 218-19 (Va. 2007).

Both Officer Brickey and Chief Surber argue that Jackson has failed to state a claim against them because the Complaint lacks factual allegations to show that either initiated Jackson's prosecution.

Because prosecutors are normally granted absolute immunity from malicious prosecution claims, *Imbler v. Pachtman*, 424 U.S. 409, 420-21 (1976), the defendant in a malicious prosecution action is typically a non-prosecutorial figure who successfully influenced the official decision to prosecute. *Hartman v. Moore*, 547 U.S. 250, 262 (2006). For the purposes of meeting the "initiation" element of the tort, the plaintiff must plead not only "that the nonprosecuting official acted in retaliation, [but also] that he induced the prosecutor to bring charges that would not have been initiated without his urging." *Id.*

While I can easily find that Officer Brickey initiated Jackson's prosecution by way of his participation as the arresting officer, *see O'Connor v. Tice*, No. 091941, 2011 WL 111587, at *4 (Va. Jan. 13, 2011), Chief Surber's culpability is necessarily more attenuated. Jackson attempts to show Chief Surber's influence by alleging that during settlement negotiations, the prosecutor stated that it was Chief Surber who insisted that the prosecution not offer Jackson any deals, and later, that any deal should include a formal apology by Jackson to the Saltville police. While these allegations would tend to support retaliatory animus and Chief Surber's participation

in the prosecutorial process, they fail to bridge the required gap "between the nonprosecuting government agent's motive and the prosecutor's action." *Hartman*, 547 U.S. at 263. Jackson's allegations do not show that, but for Chief Surber's influence, the Commonwealth would have pursued a different course of action in its prosecution of the case. Without plausibly pleading such facts, Chief Surber cannot be said to be the proximate cause of the prosecution.

Finally, Officer Brickey additionally defends on the basis that Jackson's arrest was grounded in probable cause. His defense is rejected at this stage for the reasons stated earlier. The Town defends based on the § 1983 municipal liability pleading requirements earlier stated. That defense is credited, for the same reasons discussed above.

For these reasons, the Motion to Dismiss Jackson's § 1983 malicious prosecution claim and corresponding state law claim is denied as to Officer Brickey, but granted as to Chief Surber and the Town.


V

The Motion to Dismiss also requests that I dismiss Jackson's claims for punitive damages. Punitive damages are available under § 1983 and Virginia tort law only where the plaintiff shows "reckless or callous indifference to the federally

protected rights of others, *Smith v. Wade*, 461 U.S. 30, 56 (1983), or actions that are "so wanton or reckless as to manifest the willful disregard of the rights of others." *Evans v. Schuster*, 16 S.E.2d 301, 303 (Va. 1941) (internal quotation marks and citations omitted).   Given the liberal pleading standards for demonstrating malice under Federal Rule of Civil Procedure 9(b) and the facts as currently presented, I deny the motion at this stage.   I will dismiss, however, the plaintiff's claim for injunctive relief.   Jackson's pleadings do not show why such a remedy would be indicated.

## VII

Finally, Officer Brickey has filed a Motion to Strike, pursuant to Federal Rule of Civil Procedure 12(f), requesting the court to strike the Complaint's factual allegations as to members of Jackson's family, and their arrests.[3]   He also requests the court to strike the Complaint's allegations against nonparties to the action, including  officials of the Town of Chilhowie who allegedly have harassed Jackson.

I agree that there is insufficient allegations of facts to show that any alleged harassment that Jackson has received is attributable to Officer Brickey or any of the

---

[3]  Shirley Jackson has now filed a separate suit in this court. *Jackson v. Brickey*, No. 1:11CV00001 (filed Jan. 3, 2011).

other named defendants, and I will strike those allegations. While the Complaint's allegations concerning the other members of Jackson's family may exceed that which is necessary for a "short and plain statement of the claim," as mandated by Rule 8(a)(2), I believe that a relevant description of the events in question does not justify striking those allegations. Whether they will be admissible in any further proceedings in the case I do not decide.[4]

## VIII

For the foregoing reasons, it is **ORDERED** as follows:

1. The Motion to Dismiss (ECF No. 13) is GRANTED in part and DENIED in part;

2. The Motion to Dismiss the claims against Chief Barry S. Surber is GRANTED and all such claims are dismissed;

4. The Motion to Dismiss the claims against the Town of Saltville is GRANTED and all such claims are dismissed;

5. The Motion to Dismiss as to Count V ("False Arrest Claim Under Virginia Common Law") against Officer Brickey is GRANTED and such claim is dismissed;

6. The Motion to Dismiss as to the claim for injunctive relief is GRANTED and such claim is dismissed;

---

[4] There is no question but that Jackson's Complaint is extravagant not only in its length (29 pages and 114 numbered paragraphs), but also in its tone, containing numerous underlinings and italics for emphasis and provocative bold headings, such as, "Part of a Larger Conspiracy?" (Compl. p. 16) and, "Things Go From Bad To Worse" (*id.* at p. 4). Surely *Iqbal* does not require such spin and one wonders what counsel's aim is in drafting such a pleading. It certainly does not help to persuade the court.

7.     The Motion to Dismiss is otherwise DENIED;

8.     The Motion to Strike (ECF No. 17) is GRANTED in part and DENIED in part;

9.     The Motion to Strike as to the allegations of the Complaint in paragraphs 65, 66, 67, 68, and 69, concerning an alleged conspiracy by the defendants with certain nonparties is GRANTED and those allegations are stricken; and

10.    The Motion to Strike is otherwise DENIED.


ENTER: February 11, 2011

/s/ JAMES P. JONES
United States District Judge